1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                     June 2015 Grand Jury

11  UNITED STATES OF AMERICA,            No. CR 15-0330(A)-GW

12              Plaintiff,               F I R S T
                                         S U P E R S E D I N G
13              v.                       I N D I C T M E N T

14  TOROS ONIK YERANOSIAN,               [18 U.S.C. § 1349: Conspiracy
       aka "Toros Yeranosyan,"           to Commit Health Care Fraud;
15  OXANA LOUTSEIKO,                     18 U.S.C. § 1347: Health Care
       aka "Oxana Loutseyko,"           Fraud; 18 U.S.C. § 2(b):
16  AHARON ARON KRKASHARYAN,             Causing an Act to be Done;
       aka "Agaron Krkasharyan," and    18 U.S.C. § 371: Conspiracy
17  MARIA ESPINOZA,                      to Pay and Receive Health
       aka "Maria Piril,"               Care Kickbacks; 18 U.S.C.
18     aka "Maria Gonzalez,"            §§ 981(a)(1)(C), 982(a)(7);
       aka "Maria Guadalupe Espinoza,"  28 U.S.C. § 2461(c): Criminal
19     aka "Maria Guadalupe Piril,"     Forfeiture]

20              Defendants.

21

22

23        The Grand Jury charges:

24                        COUNT ONE

25                  [18 U.S.C. § 1349]

26  A.   INTRODUCTORY ALLEGATIONS

27

28        At all times relevant to this First Superseding Indictment:

The Conspirators

1.  Defendant TOROS ONIK YERANOSIAN, also known as ("aka") "Toros Yeranosyan" ("YERANOSIAN"), was the co-owner and co-operator of Mauran Ambulance Service, Inc. ("Mauran"), an ambulance transportation company located in San Fernando, California.

2.  Defendant OXANA LOUTSEIKO, aka "Oxana Loutseyko" ("LOUTSEIKO"), was a general manager of Mauran.

3.  Defendant AHARON ARON KRKASHARYAN, aka "Agaron Krkasharyan" ("KRKASHARYAN"), was a manager of Mauran.

4.  Defendant MARIA ESPINOZA, aka "Maria Piril," aka "Maria Gonzalez," aka "Maria Guadalupe Espinoza," aka "Maria Guadalupe Piril" ("ESPINOZA"), was an employee of a dialysis treatment facility located in the County of Los Angeles, California.

5.  Co-conspirator 1 ("CC-1") was the co-owner and co-operator of Mauran.

6.  Co-conspirator 2 ("CC-2") was a manager and biller of Mauran.

7.  Co-conspirator Christian Hernandez, aka "Cristian Hernandez" ("Hernandez"), was a Dispatch Supervisor for Mauran.

The Medicare Program

8.  The Medicare Program ("Medicare") was a federal health care benefit program, affecting commerce, which provided benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a

2

1  "health care benefit program" as defined by Title 18, United

2  States Code, Section 24(b).

3       9.   Medicare was subdivided into multiple parts.  Medicare

4  Part B covered, among other things, ambulance services.

5       10.  Individuals who qualified for Medicare benefits were

6  commonly referred to as "Medicare beneficiaries."  Each Medicare

7  beneficiary was given a Medicare identification number.

8       11.  Medicare covered ambulance services only if furnished

9  to a beneficiary whose medical condition at the time of

10 transport was such that ambulance transportation was medically

11 necessary.  A patient whose condition permitted transport in any

12 type of vehicle other than an ambulance did not qualify for

13 Medicare payment for ambulance services.  Medicare payment for

14 ambulance transportation depended on the patient's condition at

15 the actual time of the transport regardless of the patient's

16 diagnosis.  To be deemed medically necessary for payment, the

17 patient must have required both the transportation and the level

18 of service provided.

19      12.  Ambulance transportation was only covered by Medicare

20 when the patient's condition required the vehicle itself or the

21 specialized services of the trained ambulance personnel.  A

22 requirement of coverage was that the needed services of the

23 ambulance personnel were provided and clear clinical

24 documentation validated their medical need and their provision

25 in the record of the service, which was usually documentation in

26 the form of a "run-sheet."  During an ambulance transport,

27 Emergency Medical Technicians ("EMTs") are required to complete

28 a "Patient Care Report" ("PCR"), often called a "run-sheet" or

1  "run-ticket," in order to document the patient's medical
2  condition at the time of the transportation, and any relevant
3  details about the transportation itself.

4      13.  In the absence of an emergency condition, ambulance
5  services were covered by Medicare only under the following
6  circumstances: (a) the patient being transported could not be
7  transported by any other means without endangering the
8  individual's health; or (b) the patient was before, during, and
9  after transportation, bed confined.  For purposes of Medicare
10  coverage, "bed confined" meant the patient met all of the
11  following three criteria: (a) unable to get up from bed without
12  assistance; (b) unable to ambulate; and (c) unable to sit in a
13  chair (including a wheelchair).

14      14.  A thorough assessment and documented description of
15  the patient's current medical state was essential for coverage.
16  All statements about the patient's medical condition or bed
17  confined status must have been validated in the documentation
18  using contemporaneous, objective observations and findings.

19      15.  For ambulance services to have been covered by
20  Medicare, the transport must have been to the nearest
21  institution with appropriate facilities for the treatment of the
22  illness or injury involved.  The term "appropriate facilities"
23  meant that the institution was generally equipped to provide
24  care necessary to manage the illness or injury involved.
25  Covered destinations for non-emergency transports included:
26  (a) hospitals; (b) skilled nursing facilities; (c) dialysis
27  facilities; (d) from a skilled nursing facility to the nearest
28  supplier of medically-necessary services not available at the

4

1  skilled nursing facility where the beneficiary was a resident,
2  including the return trip, when the patient's condition at the
3  time of transport required ambulance services; and (e) the
4  patient's residence, but only if the transport was to return
5  from an appropriate facility and the patient's condition at the
6  time of transport required ambulance services.

7      16.  CMS contracted with Medicare Administrative
8  Contractors ("MACs") to process claims for payment.  From
9  October 2007 to August 2013, the MAC that processed and paid
10 Medicare Part B claims in Southern California was Palmetto GBA.
11 Noridian Administrative Services ("Noridian") was the MAC in
12 Southern California from approximately September 2013 to the
13 present.

14     17.  Most providers submitted their claims electronically
15 pursuant to an agreement they executed with Medicare in which
16 the providers agreed that: (a) they were responsible for all
17 claims submitted to Medicare by themselves, their employees, and
18 their agents; (b) they would submit claims only on behalf of
19 those Medicare beneficiaries who had given their written
20 authorization to do so; and (c) they would submit claims that
21 were accurate, complete, and truthful.

22     18.  A Medicare claim for payment was required to set
23 forth, among other things, the following: (a) the beneficiary's
24 name and unique Medicare identification number; (b) the item or
25 type of services provided to the beneficiary; (c) the cost of
26 the item or service being provided; and (d) the name and the
27 National Provider Identifier ("NPI") of the provider who
28 provided the item or service.

B.   THE OBJECT OF THE CONSPIRACY

19.   Beginning in or around February 2009, and continuing through in or around September 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-1, CC-2, co-conspirator Hernandez, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

C.   THE MANNER AND MEANS OF THE CONSPIRACY

20.   The object of the conspiracy was carried out, and to be carried out, in substance as follows:

            a.   On or about February 18, 2009, YERANOSIAN and CC-1 purchased Mauran.

            b.   On or about April 19, 2009, CC-1 opened a corporate bank account for Mauran at Bank of America, account number xxxxx-72132 ("BA Account").   CC-1 was a signatory on this BA Account.

            c.   On or about May 7, 2009, CC-1 executed and submitted an electronic funds transfer agreement ("EFT") to Medicare, requesting that all future reimbursements from Medicare be directly deposited into Mauran's BA Account.   On this EFT, defendant LOUTSEIKO is listed as a contact person for Mauran.

            d.   On or about July 22, 2010, CC-1 filed a Statement of Information with the State of California that listed CC-1 as the Chief Executive Officer, Secretary, Chief Financial Officer, and Director of Mauran.

1        e.   On or about March 22, 2011, CC-1 executed and

2   submitted an amended enrollment application to Medicare on

3   behalf of Mauran.   On this application, CC-1 is listed as

4   President of Mauran, and defendant LOUTSEIKO is designated as a

5   Delegated Official of Mauran.

6        f.   On or about May 21, 2012, CC-1 filed a Statement

7   of Information with the State of California that listed CC-1 as

8   the Chief Executive Officer, Secretary, Chief Financial Officer,

9   and Director of Mauran.

10       g.   On or about April 18, 2014, CC-1 opened a

11  corporate bank account for Mauran at Citibank, account number

12  xxxxx-14140 (the "Citibank Account").   CC-1 was the sole

13  signatory on this Citibank Account.

14       h.   On or about April 23, 2014, CC-1 executed and

15  submitted an EFT to Medicare requesting that future Medicare

16  reimbursement payments be directly deposited into Mauran's

17  Citibank Account.

18       i.   On or about September 22, 2014, CC-1 executed and

19  submitted an EFT to Medicare requesting that future Medicare

20  reimbursement payments be directly deposited into Mauran's BA

21  Account.

22       j.   Defendants YERANOSIAN, LOUTSEIKO, and

23  KRKASHARYAN, together with CC-1, CC-2, co-conspirator Hernandez,

24  and others known and unknown to the Grand Jury, knowingly

25  provided and caused to be provided ambulance transportation

26  services, through Mauran, to Medicare beneficiaries, knowing

27  that the beneficiaries' medical conditions did not make the

28  ambulance transportation services necessary.

7

k. Defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-2, co-conspirator Hernandez, and others known and unknown to the Grand Jury, instructed Mauran employees to create and document on run-sheets a purported justification for ambulance transportation services even when such a justification did not exist.

l. Defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-2, co-conspirator Hernandez, and others known and unknown to the Grand Jury, instructed Mauran employees not to write certain words, such as "walk" and "wheelchair," on run-sheets because the defendants and their co-conspirators knew Medicare would not pay for the ambulance transportation services when these words were present on run-sheets.

m. Defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-2, co-conspirator Hernandez, and others known and unknown to the Grand Jury, knowingly and willfully submitted, and caused the submission of, false and fraudulent claims to Medicare on behalf of Mauran for the medically unnecessary ambulance transportation services.

n. As a result of the submission to Medicare of false and fraudulent claims that defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-2, co-conspirator Hernandez, and others known and unknown to the Grand Jury, submitted and caused to be submitted, Medicare made payments to Mauran's corporate bank accounts, namely, the BA Account and the Citibank Account.

1          o.    Defendant YERANOSIAN and CC-1 transferred and
2    disbursed, and caused the transfer and disbursement of, monies
3    from Mauran's BA Account and the Citibank Account to themselves
4    and others.
5          p.    Defendants YERANOSIAN, LOUTSEIKO, and
6    KRKASHARYAN, together with CC-2, co-conspirator Hernandez, and
7    others known and unknown to the Grand Jury, concealed, and
8    attempted to conceal, their submission of false and fraudulent
9    claims to Medicare by altering and causing the alteration of
10   run-sheets and other documentation related to the ambulance
11   transportation services provided by Mauran.
12         q.    For dates of service between on or about February
13   18, 2009, and on or about September 5, 2013, Mauran submitted to
14   Medicare claims totaling approximately $28,011,085 for ambulance
15   transportation and related services, and Medicare paid Mauran
16   approximately $13,433,045 on those claims.
17
18
19
20
21
22
23
24
25
26
27
28

COUNTS TWO THROUGH FIVE

[18 U.S.C. §§ 1347, 2(b)]

21.   The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 18 and 20 above of this First Superseding Indictment as though set forth in their entirety herein.

A.   THE SCHEME TO DEFRAUD

22.   Beginning in or around February 2009, and continuing through in or around September 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-1, CC-2, and others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely Medicare, as to material matters in connection with the delivery of, and payment for, health care benefits, items, and services; and (b) to obtain money from Medicare by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of, and payment for, health care benefits, items, and services.

B.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

23.   The fraudulent scheme operated, in substance, as described in Paragraph 20 of this First Superseding Indictment.

C.   THE EXECUTION OF THE FRAUDULENT SCHEME

24.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendants YERANOSIAN, LOUTSEIKO, and KRKASHARYAN, together with CC-1, CC-

10

2, and others known and unknown to the Grand Jury, knowingly and
willfully executed and attempted to execute the fraudulent
scheme described above, by submitting and causing to be
submitted to Medicare the following false and fraudulent claims
for payment for Basic Life Support, non-emergency ambulance
transportation (Code A0428, Code A0425):

| COUNT | BENEFICIARY | CLAIM NUMBER | APPROX. DATE SUBMITTED | APPROX. AMOUNT OF CLAIM |
|-------|-------------|--------------|------------------------|-------------------------|
| TWO | S.V. | 551111172819320 | 6/21/2011 | $621.00 |
| THREE | S.K. | 551111173170980 | 6/22/2011 | $391.50 |
| FOUR | L.E. | 551111181896000 | 6/30/2011 | $437.40 |
| FIVE | M.B. | 551111186535920 | 7/05/2011 | $526.50 |

1                          COUNT SIX

2                       [18 U.S.C. § 371]

3        25.   The Grand Jury incorporates by reference and re-

4    alleges paragraphs 1 through 18 and 20 of this First Superseding

5    Indictment as though set forth in their entirety herein.

6    A.   OBJECT OF THE CONSPIRACY

7        26.   Beginning no later than in or around 2010, and

8    continuing through in or around September 2013, in Los Angeles

9    County, within the Central District of California, and

10   elsewhere, defendants YERANOSIAN, LOUTSEIKO, and ESPINOZA,

11   together with others known and unknown to the Grand Jury,

12   knowingly combined, conspired, and agreed to pay and receive

13   kickbacks for patient referrals, in violation of Title 42,

14   United States Code, Sections 1320a-7b(b)(1)(A) and (b)(2)(A).

15   B.   THE MANNER AND MEANS OF THE CONSPIRACY

16       27.   The object of the conspiracy was carried out, and to

17   be carried out, in substance, as follows:

18            a.   Defendants YERANOSIAN and LOUTSEIKO, together

19   with others known and unknown to the Grand Jury, would agree to

20   pay, and cause to be paid, kickbacks to defendant ESPINOZA and

21   others known and unknown to the Grand Jury, in return for

22   referrals to Mauran of patients for whom Mauran would submit

23   claims to Medicare for ambulance transportation services and

24   other related services.

25            b.   After defendant ESPINOZA provided names and other

26   information of patients that defendants YERANOSIAN and LOUTSEIKO

27   could use to bill Medicare for ambulance transportations and

28   other related services, defendants YERANOSIAN and LOUTSEIKO

1  would give cash and cause cash to be given to defendant

2  ESPINOZA.

3  D.   OVERT ACTS

4       28.   In furtherance of the conspiracy and to accomplish its

5  object, defendants YERANOSIAN, LOUTSEIKO, and ESPINOZA, together

6  with others known and unknown to the Grand Jury, committed and

7  willfully caused others to commit the following overt acts,

8  among others, within the Central District of California and

9  elsewhere:

10      Overt Act No. 1:   In or around October 2010, defendants

11  YERANOSIAN and LOUTSEIKO paid and caused to be paid to defendant

12  ESPINOZA a cash kickback for patient referral(s) to Mauran.

13      Overt Act No. 2:   In or around April 2011, defendants

14  YERANOSIAN and LOUTSEIKO paid and caused to be paid to defendant

15  ESPINOZA a cash kickback for patient referral(s) to Mauran.

16      Overt Act No. 3:  In or around May 2011, defendants

17  YERANOSIAN and LOUTSEIKO paid and caused to be paid to defendant

18  ESPINOZA a cash kickback for patient referral(s) to Mauran.

19

20

21

22

23

24

25

26

27

28

1        FORFEITURE ALLEGATION

2    [18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and

3           28 U.S.C. § 2461(c)]

4        1.    Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is

5    hereby given to defendants TOROS ONIK YERANOSIAN, also known as

6    ("aka") "Toros Yeranosyan" ("YERANOSIAN"), OXANA LOUTSEIKO, aka

7    "Oxana Loutseyko" ("LOUTSEIKO"), AHARON ARON KRKASHARYAN, aka

8    "Agaron Krkasharyan" ("KRKASHARYAN"), and MARIA ESPINOZA, aka

9    "Maria Piril," aka "Maria Gonzalez," aka "Maria Guadalupe

10   Espinoza," aka "Maria Guadalupe Piril" ("ESPINOZA")

11   (collectively, "defendants"), that the United States will seek

12   forfeiture as part of any sentence in accordance with Title 18,

13   United States Code, Sections 982(a)(7) and 981(a)(1)(C) and

14   Title 28, United States Code, Section 2461(c), in the event of

15   any defendant's conviction under any of the Counts One through

16   Six of this First Superseding Indictment.

17       2.    Defendants shall forfeit to the United States the

18   following property:

19           a.    All right, title, and interest in any and

20   all property, real or personal, that constitutes or is derived,

21   directly or indirectly, from the gross proceeds traceable to the

22   commission of any offense set forth in any of Counts One through

23   Six of this First Superseding Indictment; and

24           b.    A sum of money equal to the total value of

25   the property described in subparagraph a.  For each of Counts

26   One through Six for which more than one defendant is found

27   guilty, each such defendant shall be jointly and severally

28   liable for the entire amount forfeited pursuant to that Count.

14

1          3.     Pursuant to Title 21, United States Code, Section

2     853(p), as incorporated by Title 28, United States Code, Section

3     2461(c), and Title 18, United States Code, Section 982(b), each

4     defendant shall forfeit substitute property, up to the total

5     value of the property described in the preceding paragraph if,

6     as a result of any act or omission of a defendant, the property

7     ///

8     ///

9     ///

described in the preceding paragraph, or any portion thereof

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred, sold to or deposited with a third

party; (c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or (e) has been

commingled with other property that cannot be divided without

difficulty.

A TRUE BILL

/s/
Foreperson

EILIEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

GEORGE S. CARDONA
Assistant United States Attorney
Chief, Major Frauds Section

RANEE KATZENSTEIN
Assistant United States Attorney
Deputy Chief, Major Frauds Section

PABLO QUIÑONES
Deputy Chief, Fraud Section
United States Department of Justice

DIIDRI ROBINSON
Assistant Chief, Fraud Section
United States Department of Justice

BLANCA QUINTERO
Trial Attorney, Fraud Section
United States Department of Justice

16